J-S50002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.E.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.Y.M., A/K/A J.Y.T., MOTHER | No. 1003 EDA 2015 |

Appeal from the Order entered March 4, 2015
in the Court of Common Pleas of Philadelphia County
Family Court, at No(s): CP-51-AP-000094-2015
CP-51-DP-0001048-2013

BEFORE: PANELLA, J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J. **FILED SEPTEMBER 22, 2015**

J.Y.M. a/k/a J.Y.T. ("Mother") appeals from the Order entered March 4, 2015, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her minor daughter, J.E.T. ("Child"), born in December 2009, and changed Child's permanency goal to adoption. We affirm.

On May 16, 2012, Mother was involved in an incident of domestic violence when she hit M.T., Child's putative father, with a metal strip while he was holding Child. *See* N.T., 3/4/2015, at 7-8, 49. Child was also hit and received a cut on her forehead, which required medical attention at the hospital. *See id*. at 7-8, 25-26, 49-50. Because of the incident involving Child, Mother pled guilty to Endangering the Welfare of Children in violation of 18 Pa.C.S.A. § 4304, and was indicated as a perpetrator of child abuse. *See id*. at 7-8.

In May 2013, Mother struck Child with a belt on her thighs, buttock, back, and right side of her ribs causing severe injury requiring hospital treatment. Child had red bruises on multiple parts of her body. Because of Mother's physical abuse of Child, Mother pled guilty to Aggravated Assault, in violation of 18 Pa.C.S.A. § 2702, and, for the second time, to Endangering the Welfare of Children, in violation of 18 Pa.C.S.A. § 4304. *See id*. at 10, 19. As a result, Mother was sentenced to 11½ to 23 months' incarceration, followed by eight years of probation. *See id*. at 9-10. Mother was once again indicated as a perpetrator of child abuse. *See id*. at 26.

DHS obtained an Order of Protective Custody ("OPC") for Child, and Child was placed in the custody of the Philadelphia Department of Human Services ("DHS"), where she has remained. *See id*. at 27. Child was placed with Maternal Great-Uncle. *See id*. at 22.

DHS held an initial Family Service Plan ("FSP") meeting shortly after the case came to DHS's attention. The FSP objectives established for Mother at the time were attending anger management classes, receiving mental health treatment, and attending parenting classes. *See id*. at 27. Mother testified that her mental health diagnosis consisted of depression, bipolar disorder and borderline schizophrenia. *See id*. at 13. Mother admitted that she was aware that DHS established objectives for her to meet in order for her to be reunified with Child. *See id*.

Mother was incarcerated in prison for a total of fourteen months. *See id*. at 11. Mother failed to provide DHS with any evidence that she received mental health treatment while incarcerated. *See id*. at 14-15, 30-31. Mother did not take medication for her mental health conditions for a period of her time in prison because she was pregnant, but resumed the medication after her son was born. *See id*. at 20-21 and 50-51.

While Mother was incarcerated, Child resided with Maternal Great-Uncle. *See id*. at 11. At the hearing, Maternal Great-Uncle testified that he did not receive any telephone calls from Mother requesting information about how Child was doing, nor any letters, gifts or cards from Mother addressed to Child. *See id*. 22-23. Mother did not attempt to reach Child or DHS regarding Child's progress during her incarceration. *See id*. at 33.

Mother was released from incarceration on September 11, 2014, after spending fourteen months in prison. *See id*. at 11. In January 2015, Mother first met Ishmael Jimenez, the DHS social worker assigned to the case. Mother provided some documentation regarding having taken parenting classes while in prison. However, Mother never provided DHS with any documentation evidencing her compliance with the FSP goals concerning anger management or mental health treatment. In addition, Mr. Jimenez added an FSP objective concerning substance abuse in order to determine whether or not drug and/or alcohol abuse had contributed to Mother's violent behavior.

Mother testified that, during the fourteen months that she was incarcerated for physically abusing Child, she sent Child six or seven letters. *See id*. at 11. Mother also testified that she sent gifts to Child at Christmas. *See id*. at 12-13. Mother further alleged that she made calls to her mother and sister to check on Child, and that she called Child everyday but was not allowed to speak to her. *See id*. at 56, 11-12.

The court also heard testimony from Maternal Great-Uncle, who was the caregiver of Child for two years. Maternal Great-Uncle testified that, during the two years in question, Mother never called Child, nor did she send Child any letters or gifts. *See id*. at 22-23.

Mr. Jimenez also testified during the termination hearing that he had no information or documentation that Mother had completed an anger management course. *See id*. at 30. Mr. Jimenez met with Mother in January 2015, at which time, she provided him with some documentation relating to the parenting classes that she took while in prison. *See id*. at 30. At the time, Mother told Mr. Jimenez that she had been attending an anger management session, and that she planned to get involved in mental health treatment. Mother never provided Mr. Jimenez with any documentation evidencing any anger management or mental health treatments. *See id*. at 30-31. In addition, Mother never provided Mr. Jimenez with any information, documentation, or proof that she participated in any drug or alcohol treatment. *See id*. at 31. Mr. Jimenez did testify

that, ten minutes before the termination hearing, Mother produced some certificates that appeared to reflect that she had participated in some sort of programs. *See id*. at 32. However, Mr. Jimenez stated that he could not determine what the programs were, how extensive they were, and what they taught Mother. *Id*. Mr. Jimenez added that, even if the certificates indicated that Mother had completed parenting and anger management programs, it would not have changed his mind regarding whether Child should be reunified with Mother since Mother had not had any contact with Child in nearly two years. *See id*. at 33. Mother had not reached out to Child or DHS while in prison or after her release from prison in October of 2014. *See id*.

Child, who was five years old at the time of the hearing, had been living in a pre-adoptive home with her Maternal Great-Uncle and Maternal Great-Aunt. Mr. Jimenez observed Child with her current caregivers on five or six occasions over the previous six or seven months. Mr. Jimenez described Child as being joyous, bubbly, and a happy little girl. Child is very affectionate. *See id*. at 34. Mr. Jimenez noted that Child's Maternal Great-Uncle and Maternal Great-Aunt have provided Child with a safe home and are doing a great job of caring for her. *See id*. at 24. Mother testified that, in her opinion, Child was in a good home with Maternal Great-Uncle who was taking good care of her. *See id*. at 15.

On February 10, 2015, DHS filed petitions to terminate Mother's parental rights and to change the goal to adoption. An evidentiary hearing was held on March 4, 2015. At the conclusion of the hearing, the court granted DHS's petitions.

Mother filed a timely notice of appeal on April 1, 2015. She also filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on that date.[1]

We review this appeal according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[1] The trial court's docket does not reflect any appeal by Mother from the goal change order. We find that Mother has waived any challenge to the propriety of the change in permanency goal to adoption by her failure to separately appeal that order, or to raise the issue of the goal change in her concise statement of errors complained of on appeal and in her brief in the appeal from the termination of her parental rights. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by a concise statement of errors complained of on appeal and the statement of questions involved in the appellate brief is deemed waived).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). This Court need only agree with any *one* subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we conclude that the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(1) and (b). They provide as follows:

- 7 -

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1) and (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa. Super. 2008) (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

> [o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the

effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id*. (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment. The *S.P.* Court stated:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id*. at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id*.

47 A.3d at 828. The *S.P.* Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [*McCray*] at 655 (footnotes and internal quotation marks omitted). . . .

*Id*. *See also In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

On appeal, Mother argues that DHS failed to prove by clear and convincing evidence that her parental rights should be terminated. Mother emphasizes that she substantially met her FSP goals and tried to perform her parental duties. Mother also claims that she was consistently denied visitation with her daughter for the last 22 months.

In its opinion, the court found clear and convincing evidence that Mother demonstrated a settled purpose of relinquishing her parental claim to Child and failed to perform her parental duties. DHS placed Child in the care of Maternal Great-Uncle and Maternal Great-Aunt after Mother, an indicated perpetrator of child abuse, physically abused Child with a metal strip and belt resulting in a criminal conviction for aggravated assault and two convictions for endangering the welfare of Child. *See* Trial Court Opinion, 5/14/2015, at 8. The trial court noted that Mother was incarcerated for fourteen months, during which time she failed to comply with her FSP objectives. *See id*. Moreover, following Mother's release from prison on September 11, 2014, she failed to provide any documentation to DHS indicating that she was in compliance with the FSP objectives established for her by DHS in order to be reunited with Child. The trial found that, although Mother did produce some certificates at the hearing that she had

participated in some anger management and parenting programs, it could discern no evidence of how long the programs were, how extensive the programs were, and what Mother learned from the programs. *See id*. In addition, the trial court also determined that Mother failed to maintain contact with Child necessary to maintain a parental relationship. The trial court also concluded that Mother demonstrated a settled purpose of relinquishment of her parental claims to Child. Thus, the trial court ruled that DHS met its burden under Section 2511(a)(1).

Having determined that the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(1), we now review the order pursuant to Section 2511(b). With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

- 11 -

Child currently is five years old and has been living in a pre-adoptive foster home with Maternal Great-Uncle and Maternal Great-Aunt for nearly two years. *See* N.T., 3/4/2015, at 34. Mr. Jimenez testified at trial that he observed Child with her current caregivers on five or six occasions over six or seven months. *See id*. Mr. Jimenez described Child as a very happy little girl, who is very affectionate with everybody. *See id*. Mr. Jimenez opined that the Child's Maternal Great-Uncle and Maternal Great-Aunt were providing Child with a safe home and were doing a good job of caring for her. *See id*. at 34-35. Mr. Jimenez further testified that Child appeared to be bonded with her caregivers. *See id*. at 35. Finally, Mr. Jimenez opined that he did not believe that Child would be harmed in any way if Mother's rights were to be involuntarily terminated in light of the fact that Mother has not be in contact with Child for almost two years after repeatedly physically abusing Child. *See id*.

In addition, Maternal Great-Uncle testified that he was making sure that all of Child's needs were being met. *See id*. at 23. He stated that Child feels safe and comfortable in his care. *See id*. at 24.

Mother also testified that, in her opinion, Child was in a good home with Maternal Great-Uncle, who was taking care of Child. *See id*. at 15.

Based upon this evidence, we discern no abuse of discretion by the trial court in terminating Mother's parental rights to Child pursuant to Section 2511(b). It was reasonable for the trial court to conclude that

terminating Mother's parental rights would not harm Child, given that there is no evidence of any bond between Child and Mother. Moreover, Child is bonded with her foster parents.

Accordingly, we affirm the order involuntarily terminating Mother's parental rights and changing Child's permanency goal to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2015